Filed 5/8/26  State Compensation Ins. Fund v. ReadyLink Healthcare CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STATE COMPENSATION INSURANCE FUND,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>READYLINK HEALTHCARE, INC.,<br><br>Defendant and Appellant. | D083359<br><br><br>(Super. Ct. No. PSC1500168) |

APPEAL from a judgment of the Superior Court of Riverside County, Kira L. Klatchko, Judge.  Affirmed.

Roxborough, Pomerance, Nye & Adreani, Drew E. Pomerance, Vincent S. Gannuscio and Joseph C. Gjonola for Defendant and Appellant.

Rhett R. Johnson, R. Timothy O'Connor and Tony M. Chang for Plaintiff and Respondent.

ReadyLink Healthcare, Inc. (ReadyLink) appeals a judgment entered in favor of State Compensation Insurance Fund (SCIF) following orders granting motions for judgment notwithstanding the verdict (JNOV) and for a new trial.  It contends the trial court erred:  (1) in dismissing certain of its defenses and cross-claims before trial; (2) in granting the JNOV; and (3) in granting a new trial.  We disagree with the first and second contentions, and conclude the third contention is moot.  Hence we affirm.

# I.  BACKGROUND

At the core of this appeal is an insurance dispute on which nine different decisionmaking bodies[1] have weighed in over the past 20 years. Distilled to its essence, the dispute is as to what, if any, balance ReadyLink owes SCIF in premiums for a workers' compensation insurance policy (the SCIF policy) that SCIF issued to ReadyLink for the 12-month period commencing September 1, 2005 (the 2005 policy year).[2]

In discussing this dispute, we will mention the role of each of the nine bodies that have weighed in on it.  But we will focus particular attention on publicly available opinions from five of those bodies, as follows:

1. A 2009 proposed decision from an administrative law judge (the ALJ):  *In re Appeal of ReadyLink Healthcare, Inc. from the Decision of the State Compensation Insurance Fund* (Aug. 6 2009) Dept. of Ins. No. AHB-WCA-08-14 (*ReadyLink Agency Appeal*);

2. A 2009 order of the California Insurance Commissioner (Commissioner) adopting the *ReadyLink Agency Appeal* decision and designating it as precedential (Sept. 30, 2009);

3. A 2012 opinion of the Second District Court of Appeal:  *ReadyLink Healthcare, Inc. v. Jones* (2012) 210 Cal.App.4th 1166 (*ReadyLink I*);

---

[1]    These nine decisionmaking bodies include:  an administrative court; the Insurance Commissioner of the State of California; the Los Angeles County Superior Court; the Second District Court of Appeal; the United States District Court for the Central District of California; the Ninth Circuit Court of Appeal; the Riverside County Superior Court; the Fourth District Court of Appeal, Division One; and the United States Bankruptcy Court for the Central District of California.

[2]    SCIF is "a quasi-governmental entity," " 'subject to the jurisdiction and control of the state Insurance Commissioner,' " that " ' "is at once both an agency of the state and an insurance carrier." ' "  (*Cover Right Roofing, Inc. v. State Compensation Ins. Fund* (2022) 85 Cal.App.5th 415, 419.)

4. A 2014 opinion of the Ninth Circuit Court of Appeals: *ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund* (9th Cir. 2014) 754 F.3d 754 (*ReadyLink II*); and

5. A 2020 opinion of our court, the Fourth District Court of Appeal, Division One: *State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422 (*ReadyLink III*).

## A. ReadyLink, the Insurance Policy, and the Role Payroll Played in Calculating Each Year's Annual Premium

At the time the insurance policy at issue was in effect, and for some time before and after, ReadyLink was a staffing agency in the business of supplying nurses on a temporary basis to healthcare providers. For six and one-half years, from September 1, 2001, through February 28, 2007, ReadyLink contracted with SCIF to insure it under the terms of a workers' compensation insurance policy.

The insurance policy provided for ReadyLink to pay to SCIF, each policy year, a premium that was to be "determined by [reference to SCIF's] manuals of rules, rates, rating plans and classifications" and that would depend on the dollar value of ReadyLink's payroll for that year. (*ReadyLink III*, 50 Cal.App.5th at pp. 439–440; *ReadyLink I*, 210 Cal.App.4th at pp. 1169–1170.)

Because it was impossible to predict with certainty at the start of a policy year such variables as the number of jobs that would be booked that year, the number of hours that each job would require, or the rates of compensation for the nurses who would staff the jobs, the dollar value of a given year's payroll could not be known until the end of the year. Thus the policy provided: (1) for an estimated premium to be determined in advance of a given policy year; (2) for the estimated premium to be invoiced by SCIF, and paid by ReadyLink, before the policy year commenced; (3) for an audit of ReadyLink's payroll and other records to be performed by SCIF after the

3

close of the policy year; (4) for a final premium to be retroactively calculated by SCIF based on the audit's results and then, depending on whether the final premium was more or less than the estimated premium; (5) for the difference between the estimated premium and the final premium to be trued up by means of either a payment by ReadyLink to SCIF or a refund by SCIF to ReadyLink.

**B.    ReadyLink's Per Diem Program**

ReadyLink differed from other temporary-nurse staffing agencies in the manner in which it compensated its nurses. As determined by the ALJ and the Commissioner in proceedings that we describe *post*:

> "On average, a nurse working in California in 2004 earned $30.24 per hour, depending upon location, skill level, area of specialty and years of experience. Experienced nurses could earn up to twice that amount per hour. Nurses employed by ReadyLink made considerably less than the state average. In fact, nearly 60% of ReadyLink's contracts paid nurses only $6.75 per hour, just above California's minimum wage in 2005. Not one of ReadyLink's nurses made over $20.00 per hour regardless of work location or experience. Thus, a typical ReadyLink nurse working three 12-hours shifts during a one week time period would earn only $243 in wages, while their counterpart employed by the hospital itself would earn $1,088.64 in wages for that same time period. ReadyLink's hourly wage also [was] significantly lower than that paid by other nurse registries in the Los Angeles area. Hourly wages for temporary nurses in Southern California range[d] from $20 per hour to $50 per hour." (*ReadyLink Agency Appeal, supra,* Dept. of Ins. No. AHB-WCA-08-14 at pp. 11–12, fns. omitted.)

This disparity between compensation received by ReadyLink nurses and compensation received by other nurses was attributable to an approach to compensation unique to ReadyLink (the per diem program) that the ALJ and the Commissioner described as follows:

4

"ReadyLink admits the hourly wage received by its nurses is below average, and explains its ability to recruit nurses at this wage level by emphasizing its unique per diem program. Under ReadyLink's per diem program, each nurse employed by ReadyLink, regardless of where the employee lives or how long a shift the employee works, receives a daily per diem amount. . . .

"ReadyLink has developed its own proprietary software program to calculate the amount of per diem pay an employee receives on a daily basis. Initially, a ReadyLink [recruiter] will enter information from ReadyLink's hospital contract into the software program. Information entered into the system includes the amount the hospital is paying ReadyLink per hour for each nurse[ ] as well as the shifts available. Recruiters [employed by ReadyLink] merely call up on their computers the available hospital contracts[,] and the software program automatically calculates the per diem rate taking into consideration ReadyLink's expenses and profit margin. The program itself provides recruiters with the exact amount to be paid in per diem and is programmed not to exceed the federal per diem amounts listed in 41 Code of Federal Regulations, Chapter 301, Appendix A [Continental United States (CONUS) tables[3]].

"ReadyLink does not require its employees to demonstrate a permanent tax home outside of the work location, nor does ReadyLink monitor employee tax data to ensure compliance with IRS regulations. ReadyLink does not provide employees with information regarding the IRS rules, nor does ReadyLink explain the workers' compensation impact of below market wages. Thus, unlike other nurse registries, ReadyLink [nurses] working within 50 miles of their permanent tax home receive per diem

---

[3]     The CONUS tables are standardized, location-specific tables that set forth per diem employee reimbursement rates approved by the federal government. According to ReadyLink, these rates are "are standard nationwide, except for approximately 300 'non-standard areas,' generally metropolitan areas where lodging and other living costs tend to be higher."

payments just like those nurses who have relocated for their positions.[4]

> "ReadyLink does not require employees to provide any documentation regarding the use of their per diem payments. ReadyLink assumes the per diem payments are being expended for business travel purposes and does not inquire as to how per diem money is spent. ReadyLink does not collect receipts or any other information substantiating the use of the per diem payments. ReadyLink does not require its employees to return any per diem monies not spent on travel expenses." (*ReadyLink Agency Appeal, supra,* Dept. of Ins. No. AHB-WCA-08-14 at pp. 12–13, fns. omitted.)

Pursuant to its per diem program, ReadyLink categorized a substantial component of the payments it made to its nurses as expense reimbursements as distinguished from payroll. In other words, ReadyLink excluded per diem payments from payroll.

## C. SCIF's Annual Audits, and the Additional Premium SCIF Invoiced ReadyLink for the 2005 Policy Year Based on Inclusion of Per Diem Payments in Payroll

ReadyLink asserts, and SCIF does not dispute, (1) that, throughout the period during which SCIF insured it, ReadyLink supplied SCIF with records revealing the existence of the per diem program and the breakdown between per diem payments and other payments that ReadyLink made to its employees; and (2) that, in the audits that followed each of the first five years of coverage (i.e., the 2000, 2001, 2002, 2003, and 2004 policy years), SCIF's

---

4    According to the ALJ and the Commissioner, more than half of ReadyLink's nurses worked at hospitals within 50 miles of their homes.

auditors did not express any objections to ReadyLink's exclusion of per diem payments from payroll.[5]

But, following the conclusion of the 2005 policy year, things changed. According to findings of the ALJ: In 2007, while reviewing ReadyLink's payroll registers as part of an audit for the 2005 policy year, SCIF's auditor discovered that ReadyLink had been paying nurses a minimum wage of approximately $6.75 per hour plus a much higher stipulated per diem amount. Although the auditor had conducted dozens of audits of nurse staffing agencies and registries during her employment with SCIF, she had never seen an agency pay more than 50 percent of wages in the form of per diem payments or pay hourly wages that were significantly below the average hourly rate typically paid to trained, licensed, registered nurses in California. She repeatedly asked ReadyLink to furnish documentation to justify the per diem payments, but ReadyLink provided no such documentation. Based on the lack of supporting documentation, SCIF concluded that per diem payments should be included as payroll. Including those payments in payroll resulted in ReadyLink's premium increasing by $555,327.53, for a total annual premium of $800,106.00. (*ReadyLink I, supra*, 210 Cal.App.4th at p. 1170.)

On the basis of the audit findings, SCIF invoiced ReadyLink $555,327 in additional premium payments (the additional premium), on top of $253,805 in premium that ReadyLink had previously paid to it in *estimated* premium, for the 2005 policy year. ReadyLink disputed SCIF's invoice for

___

[5] SCIF contends the auditors expressed no objection to the exclusion of per diem payments from payroll during the 2000, 2001, 2002, 2003, and 2004 policy years because they did not detect it until later. ReadyLink by contrast contends the auditors expressed no objection either because the exclusion of per diem from payroll conformed to the policy's terms or for deceitful reasons, discussed *post*.

the additional premium; and, beginning in 2007, there ensued a series of proceedings involving efforts by ReadyLink to avoid, and efforts by SCIF to enforce, payment of the additional premium.

In addressing these efforts (and ReadyLink's claims of error on appeal), we proceed with a discussion in two parts. The first discussion focuses on claims of error rooted in proceedings, from 2007 to 2022, in which several decisionmaking bodies determined that a set of workers' compensation regulations known as the USRP[6] governed calculation of payroll under the SCIF policy and that the USRP required ReadyLink's per diem payments to be included in payroll.[7] Thereafter, the second discussion focuses on claims

---

[6] The term USRP refers to the California Workers' Compensation Uniform Statistical Reporting Plan—1995, which is a "compendi[um] of administrative rules and regulations governing the issuance of workers' compensation coverage by SCIF and other [insurance] carriers. They set forth classifications, rates and rating systems approved by the [Insurance] [C]ommissioner pursuant to [Insurance Code] sections 11658 and 11730 et seq. and have been incorporated by reference into the California Code of Regulations." (*ReadyLink III, supra,* 50 Cal.App.5th at p. 431, fn. 4; see also *ReadyLink I, supra,* 210 Cal.App.4th at p. 1, fn. 1 ["The provisions of the USRP . . . are part of the Insurance Commissioner's regulations, at title 10, California Code of Regulations, section 2352.1"].)

[7] Before commencing our discussion of the proceedings culminating in this appeal, we address several motions and requests that the parties filed during the pendency of the appeal. Specifically, SCIF filed a motion to dismiss and for sanctions, ReadyLink filed a cross-motion for sanctions, and each party filed a brief and a request for judicial notice in support of its motion(s) and a brief in opposition to its adversary's motion(s). (SCIF also attempted to file an unauthorized reply brief.) Each of these items pertains to arguments by SCIF that the appeal should be dismissed on the grounds that: (1) ReadyLink is not legally aggrieved by the judgment and thus lacks standing to appeal; and (2) statements ReadyLink made in a bankruptcy action (see *post*) should estop it from claiming it is legally aggrieved. Having examined the parties' arguments and the supporting documentation, we conclude the motion to dismiss is without merit, and we decline to award

of error arising from a 2023 trial, post-trial motions, and judgments that capped those proceedings.

## II. DISCUSSION ONE—The USRP and SCIF's Rate Filing

### A. Additional Background

#### 1. 2007-2014: ReadyLink's Appeals Challenging SCIF's Decision to Include Per Diem Payments in Payroll for the 2005 Policy Year, and the Role that USRP Regulations Played in Those Appeals

Between 2007 and 2012, ReadyLink initiated a series of appeals in which it challenged SCIF's inclusion of per diem payments in payroll for the 2005 policy year. The first such appeal was to SCIF's customer assistance program, the second was to the Department of Insurance (DOI), the third was to the Los Angeles County Superior Court, and the fourth was to the Second District Court of Appeal. (*ReadyLink I, supra,* 210 Cal.App.4th at p. 1170; *ReadyLink III, supra,* 50 Cal.App.5th at pp. 433–435.)

Central to each of these proceedings was the USRP. Indeed, so pivotal was the USRP to each stage in this escalation of appeals that the very first sentence of the opinion written by the ALJ read: "This appeal . . . arises from a dispute between . . . SCIF . . . and . . . ReadyLink . . . regarding the proper calculation of payroll for premium . . . purposes *under the terms of the . . . USRP.*" (*ReadyLink Agency Appeal, supra,* Dept. of Ins. No. AHB-WCA-08-14 at p. 1, italics added.) In keeping with this description of the dispute, the ALJ framed the matter before her as confined to one single question: "For policy year 2005, did SCIF properly include per diem payments made to [ReadyLink] nurses as 'payroll' or 'remuneration' *pursuant to USRP, Part 3, Section V?*" (*ReadyLink Agency Appeal, supra,* Dept. of Ins. No. AHB-WCA-08-14 at p. 2, italics added.)

---

sanctions to either party. The requests for judicial notice are granted, and the motions are denied.

9

According to the USRP, a per diem payment should be excluded from payroll if each of two requirements is satisfied. These requirements are: (1) that the "amount [of the payment] is reasonable" and (2) that "the employer's records show that the employee worked at a job location that would have required the employee to incur additional expenses not normally assumed by the employee."

The USRP does not elaborate on either of these requirements. Thus, the ALJ engaged in "a lengthy analysis, including [a] review of federal tax law," and, on the basis of this analysis, concluded: (1) that a per diem payment is "reasonable" and thus satisfies the first requirement " 'if it comports with common sense, is not lavish or extravagant, and is not made for the purpose of circumventing per diem regulations' "; and (2) that, for such a payment to satisfy the second requirement, the "employer must provide records proving that each employee receiving per diem reimbursement worked at a location that required the employee to incur 'additional duplicate living expenses and that such expenses were mitigated by per diem reimbursement.' " (*ReadyLink I, supra,* 210 Cal.App.4th at p. 1171.)

Applying this interpretation, the ALJ determined that the per diem payments ReadyLink had made during the 2005 policy year satisfied neither requirement. Specifically:

> "The [ALJ] concluded that ReadyLink failed to prove that its per diem payments were reasonable under the USRP because it paid 'a below-market hourly wage for the type of work being performed' and then used the per diem payments to 'increase[ ] its nurses' income while avoiding payroll tax liabilities for itself.' [In arriving at this conclusion, the ALJ] expressly rejected ReadyLink's contention that its per diem payments were reasonable because they comported with the federal per diem amounts

10

for the Continental United States (CONUS) listed in 41 Code of Federal Regulations, Chapter 301, Appendix A . . . . Instead, the [ALJ] found that ReadyLink failed to prove the per diem payments reflected the traveling nurses' anticipated living expenses, failed to show that its nurses worked at locations that required additional duplicate living expenses beyond normal commuting expenses, failed to monitor employee eligibility for per diem payments, and failed to require its employees to substantiate their per diem expenses." (*ReadyLink I, supra,* 210 Cal.App.4th at p. 1171; see also *ReadyLink Agency Appeal, supra,* Dept. of Ins. No. AHB-WCA-08-14 at pp. 16–40.)

As noted *ante*, the ALJ set forth her analysis, findings, and conclusions in a proposed decision that issued in 2009. Then, in an order issued that same year, the Commissioner adopted the ALJ's proposed decision and designated it as precedential. Thereafter, ReadyLink sought review of the Commissioner's order by filing a petition for peremptory writ of administrative mandamus in Los Angeles County Superior Court. (*ReadyLink I, supra,* 210 Cal.App.4th at p. 1172.) That court denied the writ (*ibid.*), whereupon ReadyLink appealed to the Second District Court of Appeal. In 2012, the Second District affirmed, (*id.,* at pp. 1168, 1188)[8] and its opinion became final following the denial of a petition for review filed in the California Supreme Court. (*ReadyLink II, supra,* 754 F.3d at p. 756.)

### 2. 2015-2022: SCIF's Collection Action Against ReadyLink, and ReadyLink's Discovery that It Was SCIF's Rate Filing,

---

[8] In 2011, while the matter was pending before the Second District Court of Appeal, ReadyLink filed a putative class action lawsuit against SCIF in the United States District Court for the Central District of California, contending federal law preempted the Commissioner's decision. (*ReadyLink II, supra,* 754 F.3d at pp. 756–757.) The district court dismissed that suit on abstention grounds, and in 2014 the Ninth Circuit Court of Appeals affirmed. (*Id.,* at p. 757.)

**Not the USRP, that Governed the Computation of Payroll For Purposes of Calculating Premiums**

a.      **SCIF's Complaint, ReadyLink's Answers, Entry of Judgment, and Reversal of Judgment**

Notwithstanding the decisions of the ALJ, the Commissioner, the Los Angeles County Superior Court, the Second District, the federal district court, and the Ninth Circuit, ReadyLink did not remit the $555,327.53 in additional premium to SCIF. Thus, in 2015, SCIF initiated the lawsuit from which the present appeal is taken.

SCIF initiated the lawsuit with the filing of a complaint for breach of contract[9] in a new forum: Riverside County Superior Court. ReadyLink responded by filing an answer that included a general denial and asserted nine affirmative defenses. (*ReadyLink III, supra,* 50 Cal.App.5th at p. 437.)

SCIF filed a motion for judgment on the pleadings targeting the answer. The trial court granted the motion with leave to amend. ReadyLink then filed an amended answer that included a general denial, asserted six affirmative defenses—estoppel, ratification, fraud, unclean hands, waiver, and violation of Insurance Code section 381[10]—and added, in support of those defenses, a set of allegations to the effect that ReadyLink's decision to

---

9      The complaint also asserted two claims in the nature of common counts. But, inasmuch as the distinctions among these claims and the breach of contract claim are not significant for the purposes of this appeal, we use the term breach of contract to refer to all three.

10      The defense of violation of Insurance Code section 381 was premised on language in that section pertaining to insurance policies "of a character where the exact premium is only determinable upon the termination of the contract." (Ins. Code § 381, subd. (f)(2).) That language requires that such policies specify "the basis and rates upon which the final premium is to be determined and paid." (*Ibid.*)

12

insure with SCIF for the 2005 policy period had been induced by deceptive conduct on the part of SCIF. In this regard, the amended answer alleged:

– That "ReadyLink [had been] upfront with SCIF about its compensation structure and fully disclosed its per diem [program] to SCIF."

– That, "with full knowledge of [ReadyLink's compensation] structure," SCIF had represented "that the premium[ ] SCIF was offering" "would be based upon ReadyLink's compensation method" and would be "the premium SCIF would charge."

– That "SCIF [had] repeatedly audited ReadyLink for [prior policy] years," yet "did not say a peep to ReadyLink about whether ReadyLink's compensation formulas could lead to an additional premium down the road."

– That, "[b]ased upon SCIF's audits, ReadyLink believed, and had every reason to believe, that SCIF had looked at ReadyLink's payroll practices and properly charge[d] premiums based on those practices."

– That "SCIF either intentionally or recklessly quoted premiums to ReadyLink [that] SCIF either knew or should have known were false," thereby using "a classic bait and switch of quoting a lower premium to ReadyLink[,] knowing SCIF would come back years later and contend ReadyLink did not properly classify its payroll and, therefore, was subject to a higher premium."

SCIF filed a motion for judgment on the pleadings with respect to the amended answer. (*ReadyLink III, supra,* 50 Cal.App.5th at p. 439.) The trial court granted the motion without leave to amend and entered judgment in favor of SCIF. (*Id.,* at pp. 440–441) ReadyLink appealed the judgment to the Fourth District Court of Appeal, Division One (*id.,* at p. 442); and, in 2020, this court reversed.

13

In reversing the trial court, the court of appeal noted ReadyLink's acknowledgment "that it [had] previously litigated and lost its challenge to SCIF's decision to include per diem amounts as payroll for the 2005 insurance year" and agreed with ReadyLink that the trial court nonetheless had erred in concluding that the amount of premium ReadyLink owed SCIF for the 2005 policy year had been determined in the prior proceedings. (*ReadyLink III*, 50 Cal.App.5th at pp. 429–430.) Summarizing ReadyLink's position and its own reasoning in reversing the judgment, the court of appeal wrote:

> "ReadyLink . . . argues [1] that it has never had the opportunity to challenge whether SCIF otherwise properly calculated the premium amount that it claims is due, pursuant to the terms of the contract between the parties, or [2] whether SCIF's past conduct, which ReadyLink alleges includes SCIF's acceptance of ReadyLink's exclusions of its per diem payments from payroll in prior policy years and SCIF's exclusion of per diem amounts in paying out on workers' compensation claims filed by ReadyLink employees, might bar SCIF from being entitled to collect that premium amount under the contract.

> "We agree with ReadyLink that the trial court erred in granting SCIF's motion for judgment on the pleadings. A full review of the collateral administrative and judicial proceedings [including the *ReadyLink Agency Appeal, ReadyLink I,* and *ReadyLink II* opinions] demonstrates that ReadyLink and SCIF have not previously litigated the vast majority of issues raised by SCIF's action seeking to collect additional premium amounts from ReadyLink, and further reveals that those issues could not have been litigated in the administrative action. We therefore reverse the judgment." (*ReadyLink III*, 50 Cal.App.5th at pp. 429–430.)

14

### b.    Rate Deviations

As discussed ante, the issues litigated in the *ReadyLink Agency Appeal* revolved around whether or not ReadyLink's per diem program complied with the USRP.  But, notably, workers' compensation insurers are not required to hew to the USRP rates in devising their approaches to setting premiums.  Rather, the Insurance Code permits them to *depart* from the USRP rates by filing "rate deviations" with the Office of the Insurance Commissioner (OIC).  (Ins. Code § 11734, subd. (b) ["[a]n insurer may develop its own classification system upon which a rate may be made or adopt the classification system" of the USRP].)

### c.    ReadyLink's Discovery that the Computation of Payroll For Purposes of Calculating Premiums Under the SCIF Policy Was Governed Not By the USRP, But by SCIF's Rate Filing

ReadyLink contends that, at some point prior to entry of the second order granting judgment on the pleadings in the present case (see *ante*), it made a discovery that completely changed the complexion of the case.  Specifically, it says it learned that a fundamental premise undergirding the *ReadyLink Agency Appeal* and the decisions of the Commissioner and courts that flowed from it—the premise that calculation of premiums under the SCIF policy was governed by the USRP—was incorrect, and that the calculation of such premiums was instead governed by a wholly different standard.

As expressed by ReadyLink's counsel, in a letter he sent to SCIF in 2017:

> "[At the time of the 2007 audit,] SCIF used the language of the . . . USRP to reject ReadyLink's position concerning the exclusion of per-diem payments [from] payroll . . . in SCIF's premium calculation.  [¶ . . . ¶]  Throughout [the ensuing appeal to the OIC], SCIF continued to represent that the

15

USRP's provisions . . . governed the premium dispute. [¶ . . . ¶] The [ALJ], having no reason to question SCIF's representation . . . , issued a decision favorable to SCIF. Currently, SCIF and ReadyLink are engaged in litigation in which SCIF has continued to contend that the language of the USRP controls. In fact, SCIF has calendared . . . a court hearing on its Motion for Judgment on the Pleadings based upon this same position.

"However, ReadvLink has discovered that SCIF's representations on this issue made to ReadyLink[,] . . . to the [DOI] and to the state and federal courts have been *false*. The USRP is in fact *irrelevant* to the dispute because . . . *SCIF did not adopt the USRP's provisions . . . pertaining to per diem but rather, via its own rate filings, SCIF adopted a different, more lenient standard.*"

What ReadyLink characterized as a "more lenient" standard is set forth in the right-hand column of this chart, which juxtaposes the standard expressed in the USRP and the standard expressed in SCIF's rate filing:

| Per Diem Payments Are Excluded from Payroll . . . | |
|---|---|
| Under The USRP | Under the SCIF Rate Filing. |
| if the "amount is reasonable and the employer's records show that the employee worked at a job location that would have required the employee to incur additional expenses not normally assumed by the employee." | if the amount is "based on actual or documented expenditures by an employee and . . . [is] of a type not normally assumed by an employee." |

According to ReadyLink, SCIF had exercised its right to deviate from the USRP[11] but concealed this information from ReadyLink, the ALJ, the

---

[11] The trial court, in its ruling on a summary adjudication motion discussed *post*, said the record before it "suggest[ed]" that the SCIF rate filing revealing that SCIF had opted out of the USRP's standard for calculating premiums was part of the record before the ALJ in 2009. And SCIF argues that ReadyLink has been aware of the SCIF rate filing throughout *all* of the

DOI, and the courts,[12] and the difference mattered. As argued in ReadyLink's opening brief on appeal:

> "State Fund thus deviated from the USRP by eliminating the requirements that the expenditures be "reasonable" and that they be determined solely by the "employer's records" or by the location of the job site. The [SCIF] rate filing only requires that the expenditures be "actual *or* documented" and be of a type not normally assumed by the employee.
>
> "By giving the employer the alternative to provide either "actual" *or* "documented" expenditures, State Fund gave the employer one of two separate and distinct means to establish the legitimacy of the per diem expenses. First,

---

legal proceedings, but chose for strategic and tactical reasons not to argue it to the ALJ. ReadyLink, for its part, asserts: that it "had no reason to suspect [at that time] that SCIF had opted out of the USRP" standard; that SCIF "apparently never disclosed to anyone directly involved in the dispute . . . that it [had done] so;" and that ReadyLink, the ALJ, the Commissioner, and the courts reasonably relied on SCIF's representations that calculation of SCIF premiums was governed by the USRP. We express no opinion as to when ReadyLink knew or should have known about the deviation in SCIF's rate filing.

[12] The trial court, in its ruling on a summary adjudication motion discussed *post*, said the record before it "suggest[ed]" that the SCIF rate filing revealing that SCIF had opted out of the USRP's standard for calculating premiums was part of the record before the ALJ in 2009. And SCIF argues that ReadyLink has been aware of the SCIF rate filing throughout *all* of the legal proceedings, but chose for strategic and tactical reasons not to argue it to the ALJ. ReadyLink, for its part, asserts: that it "had no reason to suspect [at that time] that SCIF had opted out of the USRP" standard; that SCIF "apparently never disclosed to anyone directly involved in the dispute . . . that it [had done] so;" and that ReadyLink, the ALJ, the Commissioner, and the courts reasonably relied on SCIF's representations that calculation of SCIF premiums was governed by the USRP. We express no opinion as to when ReadyLink knew or should have known about the deviation in SCIF's rate filing.

the employer can collect an employee's actual receipts and compute the actual amount of expenses for which reimbursement is appropriate.  Alternatively, if the employer does not wish to collect actual receipts or other evidence of expenses, it may nevertheless still comply by being able to otherwise *document* the basis of the per diem payments.  One means to document the expenses is to show compliance with the IRS Federal CONUS tables.  IRS Publication 1542 states that the tables provide 'the maximum per diem rate' without treating part of the per diem allowance as wages for tax purposes. . . .   At all relevant times, ReadyLink's per diem payments were 'documented' expenses within the meaning of the [SCIF] rate filing, as the payments were made pursuant to the documented IRS CONUS tables."

### d.    ReadyLink's Cross-Complaint

In 2022, after SCIF's lawsuit returned to the trial court, ReadyLink filed a motion for leave to file a cross-complaint asserting claims for fraud, breach of contract, and promissory estoppel; and the trial court granted the motion.

The cross-complaint represented both a continuation of and a departure from the positions that ReadyLink had taken in its amended answer.  It represented a continuation inasmuch as it included allegations, similar to those set forth in its amended answer, focusing on *conduct by SCIF that allegedly had induced ReadyLink to belie*ve, prior to the audit, that, in 2005, per diem payments would continue to be excluded from payroll (e.g., the allegations, discussed *ante*, supporting the affirmative defenses of estoppel, ratification, fraud, unclean hands, waiver, and violation of Insurance Code section 381.)

But the cross-complaint represented a *departure* from the answer in that it also included allegations, similar to those set forth in the letter ReadyLink's counsel had sent to SCIF in 2017, focusing on *provisions of the*

18

*SCIF policy and SCIF rate filing that allowed* for per diem payments, in certain circumstances, to be excluded from payroll (e.g., the SCIF rate filing that ReadyLink's counsel had accused SCIF of having concealed in the prior proceedings).

### e. SCIF's Motion for Summary Judgment, or in the Alternative for Summary Adjudication, and Its Demurrer to the Cross-Complaint

While ReadyLink's motion for leave to file its cross-complaint was pending, SCIF filed a motion for summary judgment or, in the alternative, for summary adjudication (collectively, MSJ); and, while *that* motion was pending, it filed a demurrer to the cross-complaint. Ruling first on the MSJ, the trial court decided that ReadyLink's estoppel defense presented "a triable issue of fact as to whether [SCIF]'s conduct from 2000-2005 [had] misled ReadyLink[,] causing it to reasonably believe that its per diem practices were consistent with [SCIF]'s policy." On this basis, the court denied the motion for summary judgment. But it granted summary adjudication with respect to ReadyLink's fraud and Insurance Code section 381 defenses. Then, the following week, the court sustained the demurrer to the cross-complaint, but granted ReadyLink leave to amend.

### f. ReadyLink's Amended Cross-Complaint, and the Demurrer SCIF Filed in Response to It

ReadyLink filed an amended cross-complaint in which it elaborated on the allegations of the original cross-complaint and asserted cross-claims for breach of contract, fraud, negligent misrepresentation, and promissory estoppel. SCIF demurred to the amended cross-complaint, and the trial court sustained the demurrer with respect to the fraud, negligent misrepresentation, and promissory estoppel cross-claims, but permitted the breach-of-contract cross-claim to proceed.

19

### g. The Bifurcation Motion and the Motions in Limine

As trial approached, SCIF filed motions in limine and a motion to bifurcate that resulted in evidence pertaining to the SCIF rate filing being excluded; in SCIF's breach of contract claim and ReadyLink's waiver defense being tried to a jury; and in resolution of ReadyLink's estoppel defense and breach of contract cross-claim being deferred to a postverdict phase of the case.[13]

The trial court's rulings on the MSJ, the demurrers, the motions in limine, and the motion to bifurcate had the effect of (1) preserving for trial ReadyLink's defenses focusing on *conduct by SCIF that allegedly had induced ReadyLink to belie*ve, prior to the audit, that, in 2005, per diem payments would continue to be excluded from payroll, but (2) eliminating from the case ReadyLink's claims and defenses focusing on *provisions of the SCIF policy and SCIF rate filing* that allowed per diem payments, in certain circumstances, to be excluded from payroll.

## B. ReadyLink's Claim of Error with Respect to the Elimination of Claims and Defenses

ReadyLink contends the trial court erred in eliminating from the case its claims and defenses focusing on provisions of the SCIF policy and SCIF rate filing that allowed per diem payments, under certain circumstances, to be excluded from payroll. In support of this contention it argues that, because prior proceedings were based exclusively on the USRP, it was denied an opportunity to prove that its per diem payments "compl[ied] with" or

---

[13] It is unclear what became of ReadyLink's ratification, fraud, and unclean hands defenses. The parties do not mention those defenses in their appellate briefs. Hence we deem them forfeited. (*Howard Jarvis Taxpayers Assn. v. City of Los Angeles* (2025) 116 Cal.App.5th 1208, 1219 fn. 3 [issues not raised on appeal are forfeited].)

20

"were made pursuant to the documented IRS CONUS tables" and, therefore, "were 'documented' expenses within the meaning of the [SCIF] rate filing."

## C.  Analysis

In examining ReadyLink's contention, we begin by observing that the rate filing's phraseology is inherently ambiguous.  As noted *ante*, the rate filing provides that per diem payments are excluded from payroll if the amount is "based on *actual or documented* expenditures by an employee and . . . [is] of a type not normally assumed by an employee" (italics added). But the terms "actual" and "documented" are not mutually exclusive.  Hence, at the outset of our analysis, we struggle to understand the purported dichotomy in the rate filing's disjunctive reference to the two terms.[14]

But, irrespective of the meaning one might choose to ascribe to the term "actual" in the rate filing, we cannot accept the meaning ReadyLink advocates for actual's alternative:  "documented."  Certainly, "documented" is susceptible to a variety of meanings.  But one meaning to which it is not susceptible is the one underlying ReadyLink's contention.

As discussed *ante*, ReadyLink's interpretation of "documented" in the rate filing is (1) that, "if the employer does not wish to collect actual receipts or other evidence of expenses, [then] it may nevertheless still comply by being able to otherwise *document* the basis of the per diem payments" (italics in original) and (2) that "[o]ne means to document the expenses is to show compliance with the IRS Federal CONUS tables."  But, as also noted *ante*, it already has been determined (by the ALJ and the Commissioner), and affirmed on appeal (by the Los Angeles County Superior Court and the Second District Court of Appeal), that ReadyLink in fact did not comport

---

14    The parties have not invited our attention to any evidence bearing on the origin or drafting history of the phrase "actual or documented" as used in the SCIF rate filing.

itself in a way that could be interpreted to be in compliance with regulations governing the CONUS tables.

As found by the ALJ and the Commissioner, ReadyLink made per diem payments without ascertaining the distance between a recipient's home and their job assignment and without requiring or requesting, let alone maintaining, documentation as to how the per diem funds received were spent. (See *ante.*) Under a regimen such as this, an employee would receive thousands of dollars in "per diem" payments tax-free, and be at liberty to spend those payments however they pleased, even if assigned to work at a hospital *across the street from their home.*[15]

Of the 257 nurses who ReadyLink assigned to jobs during the 2005 policy period, the ALJ found that "ReadyLink failed to prove that 142 of [them] worked outside the metropolitan area in which they lived, such that [their job assignments] would [require them to] incur duplicate living expenses not normally assumed." (*ReadyLink Agency Appeal, supra,* Dept. of Ins. No. AHB-WCA-08-14 at pp. 10, 32.) In fact, "108 of the nurses working during the policy year at issue lived within 20 miles of their place of employment" (*id*, at p. 33), many of those 140 nurses lived much closer to their assignment than that (*id.,* at pp. 10–12, 34, 41–49), and 11 of them lived in the same zip code as the job to which they had been assigned. (*Ibid.*)

---

[15]  While the ALJ's findings did not include an example quite so egregious as that, they certainly came close. Describing ReadyLink's per diem policy as "dubious," the ALJ cited, as examples of nurses receiving substantial untaxed per diem payments without records to substantiate their eligibility: a nurse "who lived one mile from the hospital [and] collected nearly $16,000 in meal and lodging expenses from ReadyLink;" one "who worked 6 miles from home [and] received $23,000 in untaxed lodging and meal expenses;" and one who, "[w]hile working for more than one year at a hospital 16 miles from her tax home, . . . collected over $47,000 in tax-free per diem payments."

In light of these circumstances the ALJ found, with reference to the 142 nurses referenced *ante*, that "[t]hese nurses clearly lived in their own homes and returned to those homes every day and night at the completion of their shift," "[n]one of [them] incurred duplicate lodging expenses nor did they incur any expenses beyond [those] normally assumed by an employee," and "no evidence was presented to prove that the IRS intended [its] regulations to reward 'temporary' employees working 10 miles from home with a tax-free windfall."[16] (*ReadyLink Agency Appeal, supra,* Dept. of Ins. No. AHB-WCA-08-14 at p. 33.)

While the standard for excluding per diem payments from payroll under the SCIF rate filing may not be the same as the standard that was before the ALJ and Commissioner (i.e., the standard under the USRP),[17] we nonetheless have no difficulty concluding that, under the SCIF rate filing, as under the USRP, invocation of the CONUS tables is meaningless in the absence of record-keeping that could demonstrate that such invocation was justified. Thus we conclude as a matter of law that, *whatever* "documented" means, it does not mean rote reliance on the amounts set forth in the CONUS tables applied to employees without documentation on an employee-by-

16     In the words of the ALJ, "[n]urses 'travelling' to and from work are merely commuting in the clearest sense, and a taxpayer's costs of commuting between home and business are nondeductible personal expenses and thus not subject to tax exempt reimbursement."(*ReadyLink Agency Appeal, supra,* Dept. of Ins. No. AHB-WCA-08-14 at p. 33.)

17     We express no view regarding the extent to which results flowing from a correct interpretation of the standard for excluding per diem payments from payroll under the SCIF rate filing should correlate with results flowing from the ALJ's interpretation of the USRP.

employee basis of, inter alia, the distance between the employee's home and work.

For the foregoing reasons, even if we were to accept ReadyLink's position that the standard set forth in the SCIF rate filing should be interpreted by reference to the CONUS tables, differences between that standard and the standard articulated in the USRP would not alter the result in this case. Thus the trial court did not prejudicially err in excluding evidence focusing on provisions of the SCIF policy and SCIF rate filing.

### III.  DISCUSSION TWO—The Trial

Having addressed ReadyLink's claim of error with respect to the trial court's narrowing of the case, we now turn to its claims of error arising from the trial that followed.  As mentioned *ante*, those claims are that the trial court erred in granting JNOV and a new trial.  To furnish some background for those claims of error, we return to our summary of this matter's procedural history, picking back up with the jury selection phase of the case.

### A.    Additional Background

### 1.     Opening Statements and Preliminary Jury Instruction

At the commencement of voir dire, each counsel delivered mini opening statements, including one in which ReadyLink's counsel conceded that SCIF's audit had been performed correctly, but contended that ReadyLink nonetheless had defenses to payment:

> "We challenged [the audit] at various agencies and courts, and we lost.  It was determined that [SCIF] did their audit correctly.  [¶]  However, even though they did their audit correctly, we contend that we have other legally valid reasons and defenses for not having to pay that premium bill.  [¶]  And that's what this trial is about, that even though the audit was correct, we still don't owe [SCIF] that additional premium."

24

Then, following voir dire and swearing in of the jurors, the trial court instructed the jury to similar effect, saying:

> "Although you will get to decide in this case whether or not ReadyLink owes premium to [SCIF] for the 2005 policy year, one issue that has already been decided and on which I now instruct you is that ReadyLink's per diem payments are considered to be payroll for purposes of calculating premium.

> "You may not reconsider that determination. However, you may consider the evidence admitted in this case for the purpose of deciding whether ReadyLink has a valid defense to [SCIF]'s claims."

Thereafter, ReadyLink's counsel delivered an opening statement in which he made clear that the crux of the defense he was going to be presenting to the jury was waiver:[18]

> "It's a pretty simple case. [¶] I think it comes down to the fact that [SCIF] misled us and [SCIF] changed the rules. They changed the rules, which misled us.

> "[¶ . . . ¶]

> "After the 2005 policy year, [SCIF] came out to ReadyLink and they conducted a routine audit of our payroll and they decided that our per diem reimbursements were payroll. [¶] They said according to the applicable workers' compensation rules and laws, our per diem was not true reimbursement, but instead, was payroll. [¶] And they claimed that because our per diem was payroll, they added

---

[18] "Waiver is the intentional relinquishment of a known right after knowledge of the facts." (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 572; accord *Lanigan v. City of Los Angeles* (2011) 199 Cal.App.4th 1020, 1030.) The thrust of ReadyLink's waiver defense was that SCIF relinquished any contractual right to include per diem payments in payroll for the 2005 policy year because it did not include such payments in payroll for the 2000, 2001, 2002, 2003, and 2004 policy years, despite knowing about the per diem program throughout those years. See *post*.

those reimbursements of per diem back into the payroll, and that resulted in an increase in premium. [¶] It was a massive increase in premium of 555,000 dollars on top of the 250,000 we had already paid for that year. [¶] That's why we're here. [¶] We haven't paid that 555,000 dollars in premium because we don't think we owe it. [¶] I told all of the jurors here in that very, very brief [mini opening] statement[,] and the judge has [instructed] you . . . [,] that we challenged that decision that per diem was payroll at both the California Department of Insurance and in subsequent lawsuits, and we lost. [¶] Those decisions said that per diem is payroll when it comes to workers' compensation. [¶] But, ladies and gentlemen, it was not until the most recent court decision in 2020 that a court told us that even though the audit was correct and even though per diem is payroll, that doesn't mean we owe [SCIF] the money for the additional premium. [¶] The court said that we have the right to go to trial and present our defenses to [SCIF]'s claim that we owe them 555,000 dollars in additional premium. [¶] And that's why we're here. Because [SCIF] misled us and they changed the rules on us. That's our defense of waiver, which you're going to hear about.

### 2.    Evidence

The presentation of evidence included testimony from several witnesses. Among them were: a premium collection specialist named Alexis Inniss, who had been employed by SCIF for 30 years; and a certified public accountant named Carlyn Irwin, who was employed by an economic consulting firm.

Inniss testified about certain features of the SCIF policy and about the invoice for the final premium. In addition, she walked the jury through SCIF's calculation of the final premium. Her testimony supported SCIF's position that ReadyLink owed it $555,327.53 in additional premium for the 2005 policy year.

26

Irwin testified that she had (1) reviewed the information ReadyLink had provided to SCIF, (2) analyzed Inniss's calculations "to determine that she was sourcing the right information from the right place," and (3) concluded, on the basis of that review, that Inniss's "math was correct." In addition, she testified that, after performing those steps, she (4) independently calculated the premium "from scratch" and (5) "concluded that the invoice was properly calculated." Her testimony (like Inniss's testimony) supported SCIF's position that ReadyLink owed it $555,327.53 in additional premium for the 2005 policy year.

ReadyLink did not rebut this evidence. Instead its counsel told the court: "I'm not going to dispute any calculation that results in what our premium is. [¶ . . . ¶] So I stipulate that the mathematical calculations on the invoice to get to 555,327 are correct."

### 3. Jury Instructions, Closing Arguments, Special Verdict Form, and Verdict

As the trial proceeded, the court and counsel engaged in discussions about jury instructions and a special verdict form. During those discussions, ReadyLink's counsel acknowledged the existence of the insurance contract and said that ReadyLink was not going to require SCIF to establish the elements of a contract because "[t]he issue in this case is whether ReadyLink proved their waiver." In keeping with these remarks, the parties agreed to dispense with a jury instruction (CACI No. 303) setting forth the elements that a plaintiff must establish to prove a breach of contract claim.

Thereafter, in his closing argument, ReadyLink's counsel returned to the waiver-focused theme of his opening statement, arguing: "It's really a simple case. [¶ . . . ¶] Is [SCIF] entitled to collect an additional 555,000 dollars in premium or did it waive its right to do so because for five straight years it never included per diem as payroll?"

27

During closing arguments the jury was presented with a special verdict form to which the parties had stipulated. In keeping with ReadyLink's counsel's mini opening statement, his traditional opening statement, and his closing argument, the liability portion of the special verdict form focused exclusively on the topic of waiver. It read as follows:

> "In this trial, [SCIF] contends that ReadyLink owes additional outstanding premium on the 2005 policy year invoice based on its audit of ReadyLink's 2005 workers compensation policy. ReadyLink contends that it does not owe [SCIF] any money because [SCIF] waived its right to include per diem in payroll for the 2005 audit. Please fill out this verdict form to indicate your decision:
>
> "1. Did ReadyLink prove by clear and convincing evidence that [SCIF] intentionally and knowingly waived its right to include per diem as payroll for the 2005 audit?
>
> "_____ Yes  _____ No
>
> "If you answered Yes to Question# 1, please skip the next question, and sign and date this verdict form. If you answered No to this question, please answer Question #2.
>
> "2. *Did [SCIF] prove by a* preponderance *of the evidence that it is owed $555,327.53 by ReadyLink?*
>
> "_____ Yes  _____ No
>
> "If you answered Yes to Question # 2, please skip the next question, and sign and date this verdict form. If you answered No to this question, please answer Question #3.
>
> "3. How much in outstanding premium does ReadyLink owe [SCIF] for the 2005 policy?
>
> "$_____" (Italics added.)

At the conclusion of its deliberations, the jury responded to the three questions in the special verdict form by selecting "No" in response to questions 1 and 2, and filling in a zero on the line for the response to question

28

3. In other words, it found against ReadyLink on the issue of liability; but it awarded no damages.

### 4. Additional Rulings and Entry of Judgment

While the jury was deliberating SCIF filed, and the trial court granted, a motion for nonsuit disposing of what remained of the cross-complaint. In addition, the trial court found for SCIF on ReadyLink's estoppel defense. Following the verdict, the entry of nonsuit, and the finding disposing of the estoppel defense, the court entered judgment: (1) "in accordance with the [s]pecial [v]erdict" on the complaint; and (2) in favor of SCIF on the cross-complaint.

### 5. Posttrial Motions and Entry of Judgment

After entry of judgment, SCIF filed motions for JNOV and for new trial on the issue of damages. In support of these motions, it argued that it had made an unrebutted evidentiary showing that the amount of premium owed for the 2005 policy period was $555,327.53 and that the jury had engaged in misconduct during deliberations.[19] The court granted both motions and directed a verdict awarding SCIF $555,327.53 in damages for breach of contract. Then, in keeping with the directed verdict, the court entered an amended judgment awarding SCIF $555,327.53. It is from the order

---

[19] In support of the motion for a new trial, SCIF filed an affidavit in which one of the jurors testified that, despite the court's instructions to the contrary, several jurors had expressed an intention during deliberations to treat the per diem payments as something other than payroll or to consider the effects that awarding damages might have on ReadyLink's ability to continue as a going concern. We do not address the contents of this affidavit because we conclude *post* that the order granting a new trial is moot.

granting a new trial and the amended judgment that the present appeal is taken.[20]

## B. ReadyLink's Claim of Error with Respect to the JNOV

ReadyLink contends the trial court erred in granting JNOV to SCIF. In addressing this contention, we begin with the legal principles governing JNOV motions.

### 1. Applicable Legal Principles

A trial court is required to render JNOV whenever a motion for a directed verdict should have been granted, had such a motion been made. (Code Civ. Proc., § 629; see also 7 Witkin, Cal. Proc. (6th ed. 2025) Trial § 427.) And a motion for directed verdict should be granted when "no other reasonable conclusion is legally deducible from the evidence," such "that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal." (*In re Lances' Estate* (1932) 216 Cal. 397, 400 (*Lances' Estate*).) Thus, a motion for directed verdict is appropriate whenever, "disregarding conflicting evidence and giving [non-movant's] evidence all the value to which it is legally entitled, including every legitimate inference which may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of [non-movant] if such verdict was given." (*Ibid.*; see also *Newing v. Cheatham* (1975) 15 Cal.3d 351, 359 [" 'A motion for

---

20    After entry of the amended judgment, ReadyLink filed for bankruptcy protection in the United States District Court for the Central District of California, triggering an automatic stay of proceedings in this case. Then, several months later (after the bankruptcy case had been closed, the stay lifted, and this case reactivated), SCIF filed a motion seeking an award of $907,998.38 in prejudgment interest. The trial court entered an order granting that motion. ReadyLink appealed that order. The appeal from that order is pending in this court as case no. D086045.

a directed verdict may be granted upon the motion of the plaintiff, where, upon the whole evidence, the cause of action alleged in the complaint is supported and no substantial support is given to the defense alleged by the defendant.' "].)

### 2. Analysis

As can be seen in our summary *ante* of what transpired at trial, SCIF presented two witnesses who testified to the appropriateness and accuracy of the $555,327.53 additional premium calculation, and ReadyLink did not rebut their testimony. ReadyLink also did not dispute any element of SCIF's breach of contract claim, and it did not prevail on any affirmative defense. In sum, at trial, after the court had instructed the jury that it could not reconsider the inclusion of per diem in payroll: (1) ReadyLink conceded that the only issue left for the jury to resolve with regard to liability was the waiver defense; (2) the jury resolved that defense against ReadyLink; (3) the court resolved the other remaining defense—estoppel—against ReadyLink; and (4) ReadyLink further conceded, as to damages, that the audit resulting in a $555,327.53 invoice had been performed correctly. As a consequence, there was no remaining defense to liability, and there was no substantial evidence that the amount SCIF was owed was zero or any other amount apart from the $555,327.53 balance that SCIF witnesses Inniss and Irwin each had independently calculated. Under circumstances such as this, it is fair to say that a finding of zero damages "would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal." (*Lances' Estate, supra,* 216 Cal. at p. 400.)

In contending to the contrary, ReadyLink points out that the jury heard testimony: (1) that SCIF was *not obligated* to collect the additional premium; (2) that it had *discretion to forego* enforcing its right to collect the additional premium; and (3) that, in exercising that discretion, it could have chosen to

31

enforce its right to collect the additional premium only *prospectively*, rather than retrospectively and "without warning" for the 2005 policy year. In this same vein, ReadyLink also points to (4) evidence that SCIF did not charge additional premium for the *2006* policy year; and (5) to a lack of evidence that SCIF *needed* additional premium, beyond the $250,000 it had received at the commencement of the 2005 policy year, "to administer [ReadyLink's] account, [to] cover the cost of claims, or for any other purpose." ReadyLink argues that such testimony amounted to substantial evidence on the basis of which the jury could reasonably have concluded that SCIF "had not suffered any damages when it chose to invoice ReadyLink for additional premium following its 2005 . . . policy year."

But this argument misapprehends the concept of harm suffered in a breach of contract case, such as this, in which a plaintiff defeats a defendant's affirmative defenses and establishes that a contract has been breached as a result of the defendant's failure to pay the monetary consideration it promised under the contract. In such a situation, the harm sustained is the promisee's loss of the benefit of its bargain; and the measure of damages is the amount that would "give the [promisee] the benefit of [its] bargain and insofar as possible . . . place [it] in the same position [it] would have been had the promisor performed the contract." (See *Overgaard v. Johnson* (1977) 68 Cal.App.3d 821, 824.) In other words, SCIF having proven that ReadyLink breached the parties' contract, and the jury and the court having rejected ReadyLink's defenses, SCIF was "entitled to damages that are the equivalent to the benefit of [its] contractual bargain." (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 968.) Those damages are set at $555,327.53, and there is no evidence as to any other amount.

32

Thus it is of no consequence that a promisee (SCIF in this case) might not be *required* to claim the amount it is owed or might be of sufficient means to get by without receiving the entirety of that amount. If it received less than what it bargained for, it is harmed. Consequently, we conclude the trial court did not err in granting JNOV.

**C.  ReadyLink's Claim of Error with Respect to the Order Granting a New Trial**

When a trial court enters JNOV *and* an order granting a new trial (new trial order), and the JNOV is appealed, the new trial order takes effect only if the JNOV is reversed. (Code Civ. Proc., § 629, subd. (d); see also 7 Witkin, Cal. Proc. (6th ed. 2025) Trial § 433.) Here, the JNOV is not being reversed. Hence the new trial order is moot, and we need not address ReadyLink's contention that the trial court erred in entering it.

## IV. DISPOSITION

The judgment is affirmed. SCIF is entitled to costs on appeal.

KELETY, J.

WE CONCUR:

DATO, Acting P. J.

DO, J.